1               UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF ARKANSAS
2                  FORT SMITH DIVISION

3  TRIBUILT CONSTRUCTION GROUP, LLC                PLAINTIFF

4       vs.          Case No. 10-2052

5  INTERNATIONAL FIDELITY INSURANCE
   COMPANY                                        DEFENDANT
6                                      and COUNTERCLAIMANT

7  INTERNATIONAL FIDELITY INSURANCE
   COMPANY                          THIRD PARTY PLAINTIFF
8
        vs.
9
   ALAN M. HARRISON, GAYE P. HARRISON,
10 JOSEPH E. MARRONE, STACY M. MARRONE,
   and SOUTHLAND ENTERPRISES, LLC      THIRD PARTY DEFENDANTS
11 _____
                              Deposition of
12                            ALAN HARRISON
                        June 24, 2010, 10:05 a.m.
13 _____
   APPEARANCES:                    ON BEHALF OF:
14
   Mr. Brian M. Meadors            Plaintiff
15 Pryor, Robertson, Beasley
    & Smith
16 P.O. Drawer 848
   Fort Smith, AR 72902-0848
17
   Mr. Jack East III               Defendant
18 Attorney at Law
   2725 Cantrell Road, Suite 202
19 Little Rock, AR 72202

20 Mr. Rex M. Terry                Third Party Defendants
   Hardin, Jesson & Terry
21 5000 Rogers, 5th Floor
   Fort Smith, AR 72903
22
   ALSO PRESENT:  Mr. Joseph Marrone
23
                      NANCY BLAND, CCR
24                    LEGAL ASSIST
                      P.O. Box 4143
25            Fort Smith, Arkansas 72914-4143
                    (479) 782-4445



EXHIBIT
F

1      Deposition of ALAN HARRISON was taken on June 24, 2010,

2   at the office of Hardin, Jesson & Terry, Fort Smith,

3   Arkansas, before me, Nancy Bland, a Certified Court Reporter

4   within and for the State of Arkansas, in a certain cause

5   styled on page one hereof.

6

7

8

9                          STIPULATION

10

11      It is hereby stipulated and agreed by and between

12   counsel for the parties hereto that the deposition testimony

13   of ALAN HARRISON may be taken before Nancy Bland, a Certified

14   Court Reporter, at the above captioned time and place.

15      Said deposition is taken pursuant to Rule 32(a)(3),

16   Arkansas Rules of Civil Procedure (Rule 30, Federal Rules of

17   Civil Procedure), with the specific understanding that any

18   objections as to relevance, immateriality, or incompetency

19   are reserved and may be made at the time the deposition is

20   first offered into evidence.  Objections as to form of

21   questions are to be noted at the time of taking of the

22   deposition.

23      All formalities with reference to taking, transcribing,

24   forwarding and filing of said deposition are waived.

25

1                     PROCEEDINGS

2        ALAN HARRISON, after being sworn, testified on his oath,

3    as follows:

4                  DIRECT EXAMINATION

5    BY MR. EAST:

6        Q.   Mr. Harrison, my name is Jack East.  I am a lawyer

7    from Little Rock and I'm representing International Fidelity

8    Insurance Company in connection with two matters involving

9    TriBuilt Construction.  One of them is pending in the Circuit

10   Court of Sebastian County, but the one we're here about today

11   is pending in Federal Court here in Fort Smith and it

12   involves a suit by your company against International

13   Fidelity.  Are you familiar with that Federal Court case?

14       A.   Yes, sir.

15       Q.   Okay.  Thank you.  Have you ever had your

16   deposition taken before?

17       A.   Once before.

18       Q.   Was it in connection with a business dispute?

19       A.   Yes, it was.

20       Q.   Was TriBuilt involved?

21       A.   No, sir.

22       Q.   All right.  Was it a former employer of yours?

23       A.   Former employee.

24       Q.   Employee of yours?

25       A.   Yes.

4

1    Q.   Okay.  How long ago was that deposition?

2    A.   2005.

3    Q.   All right.  So, it had nothing to do with this

4    NISHA job?

5    A.   No.  We hadn't even formed TriBuilt at that time.

6    Q.   All right.  Well, as you probably learned from that

7    deposition, this is just a session where I get to ask you

8    questions and you get to answer them to the best of your

9    ability.  Let me first say on the front end that I'm not here

10   to try to trick you into anything.  So, if you don't

11   understand a question, would you please let me know?

12   A.   Yes, sir.

13   Q.   Thank you.  Would you verbalize your response

14   rather than a nod of the head, a shake of the head, an uh-huh

15   or an huh-uh so that we'll on be on the same page?

16   A.   Yes, sir.

17   Q.   Thank you.  What is your background in

18   construction?

19   A.   My background is it goes back about eight or ten

20   years.  It's mostly from the direct construction supervisory

21   would be buying foreclosed properties and fixing them up and

22   reselling them.  I'm part of this construction company as the

23   president to be the administrator of the company and I do

24   development where I find a piece of property, figure out what

25   to do, get it ready to build, and then our company will build

1   it, but I'm not necessarily a field construction guy.  I'm
2   more of an operations and development officer.

3       Q.   All right.  Development and operations officer.
4   So, your role in TriBuilt is to find properties and develop
5   them?

6       A.   No, that's what my -- you asked my background.

7       Q.   Okay.  I'm sorry.

8       A.   That's how I got into where we are, but I do more
9   than that now with TriBuilt.

10      Q.   Okay.  So, what is your role with TriBuilt?

11      A.   As TriBuilt president, I'm the -- I'm the
12  administrator of the company.  I handle cash flow management,
13  banking relationships, deposits, draw requests.  I manage my
14  bookkeeper, my administrative type staff folks.  I also have
15  a role in working with customers to develop the initial
16  contract or develop the contractual relationship.  I also
17  work with the design team that the -- that the customer may
18  have.  I'm usually the person that's on the forefront with
19  the customer, with the design professionals, administrative
20  work in the office, paying bills, that kind of stuff.

21      Q.   All right.

22      A.   I'm not necessarily the guy that's going to be in
23  the field and managing a project.

24      Q.   And is that Mr. Marrone's role?

25      A.   That's part of the role that Mr. Marrone takes on.

1    Q.   All right.  So, you're the office guy, the project

2  manager type, is that correct?

3    A.   I would be the boss of the project manager.

4    Q.   Do you have a project manager employed by TriBuilt?

5    A.   Yes, we do.

6    Q.   Who's that?

7    A.   A fellow by the name of Dan Willcutt.

8    Q.   Dan Willcutt.  And how do you spell that last name?

9    A.   W-i-l-l-c-u-t-t.

10   Q.   Was he involved in the NISHA project in Conway?

11   A.   We didn't hire him until after that project had --

12  we had handed the project over.

13   Q.   So, who fulfilled the project management role on

14  the NISHA project in Conway?

15   A.   I guess you would say that I did.  I did a lot of

16  the ordering of materials, along with Joey, we kind of shared

17  some of that responsibility so that our on-site

18  superintendent would be able to focus on quality control,

19  safety, and schedule.

20   Q.   What is your educational background?

21   A.   I have a bachelor's of science degree from Arkansas

22  Tech University and I have a master's of science in

23  leadership and ethics from John Brown.

24   Q.   The bachelor of science degree, what area of study

25  was that?

```
 1      A.    Natural science, biology.

 2      Q.    Okay.   When did you graduate from Arkansas Tech?

 3      A.    1993.

 4      Q.    And a graduate of John Brown in ethics?

 5      A.    Yes, leadership and ethics, a master's degree.

 6      Q.    And when did you obtain that degree?

 7      A.    2008.

 8      Q.    Do you have any business licenses or construction

 9   related licenses?

10      A.    Well, I'm one of the qualifiers in our construction

11   company as far as the Arkansas Contractors Licensing Board.

12   We have a contractor's license for commercial construction,

13   residential construction, utility and municipal work,

14   commercial electrical and commercial plumbing.

15      Q.    So, are you a licensed plumber?

16      A.    I'm not the qualifier for the plumbing or the

17   electrical, but those are company licenses.  I'm a little bit

18   confused on if you're asking me specifically or the TriBuilt

19   licenses.

20      Q.    All right.  I'm sorry.  I'm talking about you

21   personally?

22      A.    I believe I'm the qualifier on the residential and

23   maybe on the commercial.

24      Q.    All right.  Now, the company licenses you've just

25   recited, correct?
```

8

1    A.    Yes.   Those are all of the --

2    Q.    Contractors Licensing Board one?

3    A.    Yeah.   Those are all of the classifications we

4    have.

5    Q.    All right.   What was your experience in obtaining

6    construction surety bonds prior to TriBuilt?

7    A.    I had never worked with a bonding company before.

8    Q.    All right.

9    A.    Other than just little -- like I had a mortgage

10   company and we had a mortgage broker's bond, I mean, but that

11   wasn't -- I don't think that's really a surety bond.   It may

12   be.   I don't know.   But I don't really have any experience.

13   Q.    My question was probably not the best if you're not

14   that -- when I say construction surety bonds, I mean payment

15   and performance bonds?

16   A.    Okay.   None.

17   Q.    None, okay.   So, when was TriBuilt founded?

18   A.    We formed TriBuilt, I think the legal papers would

19   say October of '06.

20   Q.    And it's an LLC?

21   A.    Yes, sir.

22   Q.    And are you the managing member?

23   A.    Yes, sir.

24   Q.    Okay.   When did you first learn of this NISHA job

25   in Conway?

 1      A.      We had another hotel under construction that we
 2  were the general contractors on and that was -- we started
 3  that project in November of '97.  We started talking with the
 4  folks from NISHA --

 5      Q.      You mean '07?

 6      A.      I'm sorry.  '07.  Thank you for correcting me.

 7      Q.      That's fine.

 8      A.      November of '07.  The owners of NISHA started
 9  visiting our job site, I believe, in May of '08, started
10  coming by and looking at the hotel we were already
11  constructing, and I think that's when we first got introduced
12  to those guys about May of '08.  Maybe -- it may have been a
13  little sooner, maybe March, but the spring of '08.

14      Q.      And can you spell their names?

15      A.      Of the people that came?

16      Q.      Yes.

17      A.      It was Andrew Desai, D-e-s-a-i.  Andy Patel,
18  P-a-t-e-l.  Samora, I can't -- I really can't pronounce his
19  name.  We all called him Sammy.  That was his American
20  nickname that he went by, but I don't -- I don't honestly
21  know how to spell his name.

22      Q.      That's fine.  And did they approach you about
23  constructing this Country Inns and Suites in Conway or did
24  you --

25      A.      No, they approached us.  They came to us and

1    solicited a bid from us.

2        Q.   And did they give you a set of plans and a project

3    manual or specifications?

4        A.   They first came by off and on for about a month or

5    so wanting to walk through our job to see quality and how the

6    cleanliness of the job and the flow of the job and I don't

7    think their plans were quite ready, and then it seemed like

8    April, May they said that they had some plans and we could

9    get them from their architect.

10       Q.   Mr. Garrett?

11       A.   Yes.

12       Q.   And Mr. Garrett is located here in Fort Smith, I

13   believe.  Do you remember when you got the drawings or the

14   plans from Mr. Garrett?

15       A.   It would have been in that same time frame, March,

16   April, May time frame.

17       Q.   Of '08?

18       A.   Of '08.

19       Q.   Mr. Harrison, I'm handing you what's been marked as

20   Plaintiff's, no, I'm sorry, Defendant's Exhibit 1, Deposition

21   Exhibit 1, pardon me, Deposition Exhibit 1.  It is dated

22   August 5th, 2008 to Andy Patel, NISHA, LLC from Alan

23   Harrison.  Do you recognize this document that's marked as

24   Deposition Exhibit 1 as your quote to them for the Country

25   Inns and Suites project?

1     A.    Yes, sir.

2     Q.    And it is two pages?

3     A.    Yes, sir.

4     Q.    Your signature appears on page two at the bottom?

5     A.    Yes, sir.

6     Q.    And you quoted $3,628,000.00 to do the job as a

7  hard bid price, is that correct?

8     A.    Fixed price bid, yes, sir.

9     Q.    All right.  Who prepared this price?  Who prepared

10  the quote to NISHA?

11     A.    I actually prepared this document.  Do you mean

12  gathered the information to come together on this number?

13     Q.    Right.  Who came with the costs to get to

14  $3,628,000.00?  Who priced the job?

15     A.    Myself and Joey Marrone, but this was not the price

16  that we originally quoted.  We actually had a closed-door

17  meeting with them and we negotiated to this number.

18     Q.    Okay.

19     A.    So, this was not the number that I presented to

20  them as our fixed price proposal.  This was what we settled

21  to after negotiating back and forth in a room for about four

22  hours.

23     Q.    All right.

24     A.    And we actually modified it in their office.  I had

25  it on my laptop and we printed it there at their office and

1   that's why it says revised.

2       Q.   All right.  So, the price you originally quoted for

3   the job was somewhat higher than $3,628,000.00?

4       A.   Yes.  I remember it to be about $3,750,000.00.

5       Q.   And then after negotiation, this was the ultimate

6   price quoted and accepted, is that correct?

7       A.   Yes.

8       Q.   I'm handing you what's been marked as Deposition

9   Exhibit 2.  It is a document that has a facsimile ribbon at

10  the top dated August 8, 2008 at 3:43 p.m., Community Bank of

11  Jacksonville, and then on the signature page, which is fax

12  ribbon page six, it's dated August 8, 2008.  Do you recognize

13  this first portion here as the contract between NISHA and

14  TriBuilt for the construction of the Country Inns and Suites

15  as of August 8, 2008?

16      A.   Yes, sir.  Yes, sir.

17      Q.   Okay.  Thank you.  And then it's got the general

18  conditions behind that, also dated August 8, '08, it's got a

19  limited warranty dated August 8, '08, and a payment schedule

20  and statement of values dated August 8, '08, is that correct?

21      A.   Yes, sir.

22      Q.   All right.  Were these documents in fact signed on

23  August 8, 2008?

24      A.   Yeah, I would think that they were if they're dated

25  that way.  I don't know why we would back date anything.

1    Q.    Assuming that they were dated or signed on August
2  8, 2008, when did the subject of obtaining payment and
3  performance bonds come up?

4    A.    I don't recall.

5    Q.    Okay.  Sure.  That's --

6    A.    I really -- I don't know when the subject came up
7  that we were going to need payment and performance bonds, but
8  -- well, that's -- I don't know when it initiated.

9    Q.    That's fine.  I'm handing you what's been marked as
10  Deposition Exhibit 3.  It's entitled Correction to Fixed
11  Contract dated September 4, 2008, apparently signed by you
12  under as managing member?

13    A.    Okay.  Right.

14    Q.    And the first part says the contractor shall
15  provide a performance bond or other necessary guarantee to
16  satisfy the owner's lender of contractor's ability to
17  complete the above project, and then that is changed to
18  contractor shall furnish payment and performance bonds to the
19  owner equal to 100 percent of the contract price.  Do you
20  remember the discussions about this?

21    A.    Yes.  This correction was required by IFIC and I
22  believe the guy's name was Sam Derby, who was the underwriter
23  or the -- I don't know what his technical term would be with
24  the company, but he had said we needed to modify our contract
25  to have language that met IFIC's requirements.

1      Q.   Okay.

2      A.   And so we told the owners and the owners agreed to

3  amend the contract.

4      Q.   All right.  Let's back up for a minute.  When did

5  you approach Brown-Hiller-Clark about getting the bonds for

6  this job?

7      A.   It was after the open date for the Microtel Inn and

8  Suites.

9      Q.   Let me see if I can help you out.

10     A.   Because I don't -- I just know generalities.   I

11  know it would be late summer of '08.

12     Q.   I do not intend to make this an exhibit, but I'm

13  handing you a Contractor Surety Questionnaire --

14     A.   Okay.

15     Q.   -- and if you'll look at the last page of that down

16  at the bottom.

17     A.   Oh, yeah, that makes sense.  End of the summer.

18     Q.   On August 25th of 2008?

19     A.   Uh-huh.

20     Q.   And did you fill out that questionnaire?

21     A.   Yes, sir.  That's my handwriting.

22     Q.   How did you come to go to Brown-Hiller-Clark?

23     A.   Our banking relationship is with First National

24  Bank and these two companies are sister companies, Brown-

25  Hiller-Clark and First National Bank, and our loan officer at

1   First National Bank encouraged us to go to Brown-Hiller-
2   Clark.

3        Q.   All right.  And then is it your understanding that
4   Brown-Hiller-Clark then contacted International Fidelity?

5        A.   Yes.

6        Q.   Did you ever meet Mr. Sam Derby?

7        A.   Yes.  That's what I was thinking about the hotel
8   because we met in the meeting room at the Microtel Inn and
9   Suites and the hotel was operational, so I knew it was at the
10  end of the summer because it opened in late July, so that's
11  why I knew it was kind of the end of the summer.  I didn't
12  know the specific dates.

13       Q.   Okay.  And did anyone attend that meeting on behalf
14  of Brown-Hiller-Clark?

15       A.   Yes.

16       Q.   And who was that?

17       A.   An agent by the name of Brent Freuh, F-r-e-u-h, I
18  believe.  I don't know if the E's before the U or vice-versa.

19       Q.   Okay.  I'm handing you what I've marked as
20  Deposition Exhibit 4.  It is entitled Agreement of Indemnity
21  and it is dated, I believe, October the 6th of 2008.  Well,
22  first of all, you did sign this, did you not?

23       A.   Yes, sir.

24       Q.   You signed it as the managing member for TriBuilt
25  and individually, did you not?

1      A.    Yes, sir.

2      Q.    Did Mr. Derby present this to you or did Mr. Freuh

3   present this to you?

4      A.    I don't remember.

5      Q.    Okay.  Was it presented at the Microtel?

6      A.    Oh, no.  No, I don't think so.  We had already had

7   that meeting and that was to get to know us and show him our

8   quality of work and that kind of stuff.

9      Q.    All right.  Did Mr. Freuh describe what was

10  contained in this document to you?

11     A.    No.

12     Q.    Did you read it?

13     A.    I reviewed it.  I just -- we had already started

14  construction and told, hey, if you want to get your bond, you

15  need to sign these forms.

16     Q.    I understand.  Okay.  I'm handing you what's been

17  marked as Deposition Exhibit 5 entitled Addendum to Fixed

18  Contract, that's the first two pages, then Work Order 1 and

19  Work Order 2 are pages three and four, another Addendum to

20  the Fixed Contract is page five, and then an Authorization to

21  Release Payment is the last page of this exhibit.  All of

22  them seem to be dated October the 15th, 2008.

23     A.    Yes, sir.

24     Q.    And is your signature on each one of them?

25     A.    Not on the last one, sir.

1      Q.    All right.  So, until we get to Authorization to

2    Release Payment, you signed as managing member on the Addenda

3    to the Fixed Contract, the Work Orders, and the Addendum at

4    the very beginning, is that correct, the first two pages?

5      A.    Yes, sir.

6      Q.    Why was the contract broken up into eight work

7    orders?

8      A.    That was Mr. Derby said that this would be the only

9    way that he could cumulatively issue payment of performance

10   bonds to total our contractual amount.  We had never had a

11   bond before.  We were still a fairly young company, so he

12   said this is the way that we can provide, that IFIC could

13   provide coverage cumulatively for the contractual amount.

14     Q.    All right.  Was this in a meeting with NISHA?

15     A.    I don't think -- NISHA was brought up to speed

16   about this, but we first worked it out with IFIC and then we

17   presented it to NISHA.

18     Q.    All right.  So, tell me about the meeting with

19   NISHA where this was presented, the Work Order schedule?

20     A.    I don't remember a lot of details about it other

21   than we just told them this is how we can get you bonded and

22   their bank was requiring that we get a bond, so they were

23   agreeable.  They didn't care as long as the bank liked it,

24   and it took the bank a little bit, but then they finally

25   accepted it, but they did have -- that's what this next

1   addendum is that brings in --

2       Q.   The next to last?

3       A.   The one where it says about the retainage.   The

4   bank was the one that pushed to increase our retainage.   Our

5   original retainage was only five percent.

6       Q.   And that increased to 15 percent?

7       A.   Yes.

8       Q.   Per Addendum -- these addenda are not numbered.

9       A.   No.   We just go by dates.

10      Q.   They're all dated the same date.   Wait, wait, wait.

11  Is that the 15th?   Is that dated the 15th?

12      A.   Yes, it is.

13      Q.   Okay.   I'm just trying to get all of the documents.

14  Okay.   I'm handing you what's been marked as Deposition

15  Exhibit 6.   Mr. Harrison, I believe I have included all eight

16  labor and material payment bonds as Deposition Exhibit 6.

17  Would you check that and make sure I've included all eight of

18  those bonds?

19      A.   The only way I'd know for sure is if I add them up

20  because I don't think they're numbered.

21      Q.   Well, if you'll look in the whereas clause there,

22  you see the second paragraph where it says work order 1?

23      A.   Oh, I do see that.   Yes, sir.   That would help.

24  Thank you.   Yes, sir.   They appear to all be there.

25      Q.   Very good.   And you signed these bonds on behalf of

1   TriBuilt?

2        A.    Yes, sir, I did.

3        Q.    All right.  I'm going to skip now from this period

4   right when you all were starting out --

5        A.    Yes, sir.

6        Q.    -- all the way to the very end.

7        A.    Okay.

8        Q.    Because you all finished the job, didn't you?

9        A.    Yeah.  We don't feel like it's quite over yet

10  because we haven't gotten paid, but until the end of we

11  handed the hotel over, yes, sir.  I understand what you're

12  talking about, though.

13       Q.    Okay.  From my review of the documents, it looks to

14  me like you at the very least substantially completed the job

15  on August 31, 2009.  Does that date ring any bells to you?

16       A.    I thought it was a little earlier, but it was -- I

17  would agree that it was at the end of August that the

18  certificate of occupancy and a conditional opening

19  certificate from Carlson was provided and they opened their

20  doors and began taking tenants or customers.  So, yes, they

21  couldn't have opened if we weren't substantially complete or

22  we believe we were complete at that point.

23       Q.    Okay.  I don't know if you can remember

24  specifically what date you consider to have been

25  substantially complete or not, but if you could, please tell

1  me?  I think I know the date you have in mind.

2      A.    I would say the day that they opened, but I thought

3  it was August the 21st for some reason.  It may have been the

4  31st, but I thought it was August the 21st when they started

5  accepting reservations and renting rooms.  In my mind,

6  Carlson was there and they wouldn't let them start taking

7  guests if it didn't meet Carlson's standards.  The city of

8  Conway wouldn't allow guests to stay if they didn't have

9  their certificate of occupancy, meaning they met all code

10  requirements and life safety issues.  So, I would say that

11  that would meet at least substantial completion, if not final

12  completion.

13      Q.    Okay.  The final pay estimate by TriBuilt to NISHA

14  was presented in early September of '09 if I remember

15  correctly?

16      A.    I think that's about right.  Yes, sir.

17      Q.    Let's go off the record for a second.

18                  [OFF THE RECORD DISCUSSION.]

19  CONTINUING BY MR. EAST:

20      Q.    I'm handing you what's been marked as Deposition

21  Exhibit 7.  I didn't make an extra copy for you.

22  MR. TERRY:    That's all right.

23      Q.    This is a letter from Carter Walker to a Ron

24  Metcalf at TriBuilt.  Who is Mr. Metcalf?

25      A.    Mr. Metcalf was our registered agent when we formed

21

```
 1   the corporation or the LLC.

 2        Q.   Did this ultimately get to you --

 3        A.   Yes.

 4        Q.   -- around August 27 of 2009?

 5        A.   Yes.

 6        Q.   I notice the fax ribbon at the top says September

 7   8th, '09, but I don't know who that went to.

 8        A.   We don't have a 501 -- I don't know if that 501

 9   number is the sent to number or who sent it or who received

10   it, but in that time frame, yes.

11        Q.   Did you talk to Mr. Davy Carter about this matter?

12        A.   No.

13        Q.   Did he call you?

14        A.   No.  He just -- out of the blue I got this letter.

15        Q.   You just got this Exhibit 7 letter out of the blue?

16        A.   Yes.

17        Q.   And you responded to it, did you not?

18        A.   Yes, sir.

19        Q.   I'm handing you what's been marked as Exhibit 8.

20        A.   Yes, sir.

21        Q.   Exhibit 8 in front of you is a letter dated

22   September 4, 2009 to Carter Walker.

23        A.   Uh-huh.

24        Q.   And is that your signature at the bottom of that

25   page?
```

1      A.   Yes, sir.

2      Q.   And so you sent Mr. Walker the profit and loss by

3   job for TriBuilt and the unpaid bills by job for TriBuilt, is

4   that correct?

5      A.   Yes, sir.

6      Q.   And so as of September 4, 2009, according to

7   TriBuilt's books, it owed $664,169.09 to subs and suppliers

8   on the NISHA job in Conway?

9      A.   Per the books, the report that I had from

10   QuickBooks at that time, yes, but I had a cover letter that

11   kind of gave some explanation about that I wasn't certifying

12   that to be 100 percent accurate.

13      Q.   Okay.  I understand.

14      A.   Okay.

15      Q.   I understand.  So, how much as of that date had you

16   billed for work at NISHA's job in Conway?

17      A.   Well, is it okay if I use this to job my memory?

18      Q.   Sure.

19      A.   Okay.

20      Q.   Oh, please.

21      A.   It shows that we have 375,000 in unpaid retainage

22   and it says that there are numerous architectural revisions

23   and modifications by the design team and that we have change

24   orders that are not resolved with the owners.  So, at that

25   point since they were still unresolved, I don't think we had

1   our final bill all put together yet because there were design

2   modifications that were either code related or structural

3   related that had to be done and that the owners authorized us

4   to talk to the architect to authorize us to do the stuff, and

5   so we had to sit down and itemize how much each one of those

6   change orders were going to be.  So, at that point I don't

7   think we had put a number to it at that point.

8       Q.   Okay.  Maybe the next exhibit will help.  I'm

9   handing you what's been marked as Exhibit 9.  Now, this is an

10  Affidavit --

11      A.   Yes, sir.

12      Q.   -- bearing your signature dated 26 October, 2009,

13  and attached is an invoice to NISHA for $666,462.12 and a pay

14  application number 12 for the period to September 22nd, '09

15  in the amount of $666,462.12.

16      A.   Yes, sir.

17      Q.   Does that pay application bear your signature?

18      A.   Yes, sir, it does.

19      Q.   All right.  I'd kind of like to stick with this pay

20  application form for a second because it says total changes

21  approved in previous months by owner down there in the change

22  order summary, additions of 45,000 and deduction of

23  $101,000.00.  Do you see that?

24      A.   Yes, sir.

25      Q.   And this final pay estimate is adding another

1   $291,000.00 plus in change orders and deducting $9,600.00 in

2   change orders --

3       A.   Yes, sir.

4       Q.   -- for net changes of $225,925.90, is that correct?

5       A.   Yes, sir.

6       Q.   All right.  How did you end up billing them for

7   almost $300,000.00 in change orders on the final billing?

8       A.   Can you clarify that?

9       Q.   Well, were these -- did all of this extra work come

10  up in August or September of '09?

11      A.   I understand what you're saying.  Typically a

12  billing cycle would be for the work completed in a particular

13  cycle.  This is more of a cumulative number over the course

14  of the hotel.  The reason why it was done this way, some

15  change orders initiated by the owners were fairly finite in

16  nature, such as we would like a retaining wall from this

17  point to this point 300 feet, three feet tall, you know.  We

18  could put a number to it because it would involve -- we could

19  have one subcontractor do it and we could get a bid.  Or if

20  they wanted to upgrade something from this model to this

21  model, we could go to the supplier and get that modification.

22  A lot of these change orders were not initiated by the owners

23  directly.  They were initiated by the owners indirectly.

24  They authorized the architect to tell us what to do because

25  there were numerous design problems.  The trades -- the

1   designers -- the designs were integrated, the mechanical,
2   electrical, and plumbing engineer and the architectural
3   designs conflicted and the structural designs conflicted with
4   the architectural designs and the MEP designs.  And so -- or
5   there were code requirements that were state required code
6   issues that were not integrated into the plans that had to be
7   modified.  Those modifications were kind of more like a time
8   and material type, you know, where we had -- we already had a
9   base bid from our electrician and then they had to go back
10  and fix these things or they had to modify these things, and
11  so the way that -- the way that it worked is they would have
12  to identify their amount of time -- there wasn't a way to
13  just say we're going to run this one wire from here to here
14  and it's going to cost you $1,000.00.  It was they were so
15  integrated between each other and there were multiple trades
16  and it was difficult to do a fixed cost change order and
17  present it to the owners.  It was, guys, these things have
18  got to be done in order to open your hotel, meet Carlson's
19  standards, meet city and state requirements, so we're going
20  to have to fix these and what it costs is what it costs.  So,
21  we already had a provision in our contract that it would be
22  whatever it cost plus five percent.  So, the architect
23  authorized us to do literally dozens and dozens of design
24  modifications and so that's where we are, and it took to the
25  end of the hotel to find out basically where we were on the

1   hotel to identify how much time through my superintendent's

2   time and the manpower that he had to designate because some

3   of the work we had to do internally, the other trades that he

4   had to identify to get involved and redo and redo it and

5   their changes, and that's how we came to these numbers.  We

6   identified the amount of time, materials, and energy that it

7   took between the multiple trades and ourselves and then we

8   identified all of the different things by going through all

9   of the plans and noting all of the various modifications to

10  the blueprints that weren't a part of the original contract.

11       Q.   How many revisions to the plans did the architect

12  or design team come up with during the course of this

13  project?

14       A.   We would have to look at the as-builts to get a

15  specific number.  I know that my general superintendent on

16  the job has in the three to 500 communication, e-mail

17  communications with the architect relating to design issues

18  and that there were, I would say, four to five dozen

19  different sets of either supplemental notes, supplemental

20  pages, revised hand drawings, whole page redrawn.  There were

21  dozens of pages revised.

22       Q.   How would the architect communicate these revisions

23  to you?

24       A.   Typically sent an e-mail with an attachment, but we

25  would be the ones that would initiate the communication.

1    Q.    And the attachment would be?

2    A.    Oftentimes it would be a handwritten sketch that he

3  scanned and e-mailed to us or he would write out a detail of

4  what he would want.  He may say use this color mortar or use

5  this size brick or use this style whatever.  He would -- a

6  lot of -- a lot of communications I would say would be

7  clarifications.  Not all of them would necessitate changes in

8  our costs and we tried to be conscious of that with the

9  owners, but there were significant cost variances in this

10  hotel.

11    Q.    All right.  I appreciate that.  Now let's go back

12  to the project debts --

13    A.    Yes, sir.

14    Q.    -- owed by TriBuilt to subcontractors and

15  suppliers.  We've got a snapshot of that debt in Deposition

16  Exhibit 8 of $664,000.00 in debt?

17    A.    Yes, sir.

18    Q.    Did TriBuilt have that kind of money to pay off

19  that debt in September of '09 without receiving the retainage

20  and payment for the change orders?

21    A.    No.

22    Q.    Did you call Mr. Derby about that?

23    A.    No.  No, I didn't.

24    Q.    Did you call Mr. Freuh about that?

25    A.    I think we may have talked to Mr. Freuh about that,

1   that we needed to get paid in order to take care of all of

2   these bills, yes.

3       Q.   Okay.  When you say we, are you --

4       A.   Oh, I'm sorry.  My partner and I.  Joey.

5       Q.   So, you did call Mr. Freuh?

6       A.   I know that I've had conversations.  I don't know

7   the time line, so I don't -- if you're asking did I do it as

8   soon as this letter went out, I don't know.  I don't know

9   what your time line that you're looking for.

10      Q.   All right.  Well, let's forget about time line.

11  When did you engage in a conversation with Mr. Freuh about

12  debt to subcontractors and suppliers on this project?

13      A.   It would have been prior to this October 26th

14  affidavit and after the hand-over to the owners in late

15  August, so that September time frame.

16      Q.   September, early October time frame?

17      A.   Yes, sir.

18      Q.   And were you a part of the conversation with Mr.

19  Freuh?

20      A.   We've had so many conversations with him.  Yes, I

21  would say that I would have been a part of the conversation

22  because I'm a principal in the company, yes.

23      Q.   Who else would have been involved in that

24  conversation?

25      A.   It would have been limited to Joey Marrone and

1  probably if there were -- if there would have been anybody

2  else, it would have probably been Cody Thompson, our

3  attorney.

4      Q.   And what did you say to Mr. Freuh?

5      A.   I don't know the specifics.  I could give you some

6  generalities.  Is that okay?

7      Q.   Sure.

8      A.   I probably -- the owners haven't released our

9  retainage and they're disputing our change orders, we've got

10 documentation for it, and without the retainage we can't --

11 we can't make these payments, what do you think we ought to

12 do.  I think that's when -- well, I think he -- I don't know

13 what his response was.  I don't recall.  I know that he was

14 the one that introduced us to Cody Thompson, so that may have

15 been his response.

16     Q.   Did you call Mr. Freuh about the debt or did he

17 call you or how did you get together with him about this

18 conversation?

19     A.   I don't remember.

20     Q.   Does Brown-Hiller-Clark handle TriBuilt's insurance

21 needs?

22     A.   Up until Friday of last week, we made an insurance,

23 just time for renewal and we made a decision and switched

24 carriers.

25     Q.   So, in the 2008-2009 time frame, Brown-Hiller-Clark

1    was TriBuilt's insurance man as well as writing the bonds?

2         A.   Yes.   There was a little bit of transition because

3    we had another agency to transition to them, so I don't know

4    if all of our policies came aboard with Brown-Hiller-Clark

5    right in January of '08, but, yeah, they started insuring us

6    in, I would say in '08, and as of last Friday they're not our

7    insurance anymore.

8         Q.   Okay.   Well, the fact that they're not writing your

9    insurance anymore, does it have anything to do with this

10   NISHA job?

11        A.   No.   Purely a premium issue.

12        Q.   Okay.   And you don't recall what Mr. Freuh said?

13        A.   No, sir.

14        Q.   But he introduced you to Cody Thompson?

15        A.   He introduced my partner at a social engagement to

16   Cody Thompson and Joey told him about our situation and then

17   Cody became our attorney.   I mean, that's the short of it.

18        Q.   What other conversations do you recall with Mr.

19   Freuh or anyone else at Brown-Hiller-Clark about the NISHA

20   project?

21        A.   Prior to filing the lawsuit against NISHA or after?

22        Q.   Both.

23        A.   I don't think I've -- afterwards it would have been

24   with our attorney, so I can't comment on that.   Prior to

25   engaging our attorney, it just would have been our

1    frustrations or in the work, our not getting paid on the

2    work, just questions about you guys got, you know, it was

3    just in relationship to, hey, how do you think we ought to

4    handle this, do you think -- what should we do, what's the

5    bond company's position going to be on something like that.

6    I think we had some conversations about that and I think he

7    might have contacted -- I do remember something along the

8    lines of, well, I'll get ahold of Sam and see what we need to

9    do.  And I think at first since there weren't any bond

10   claims, the bond company was kind of silent on the issue.

11   Sam's position was, you know, until there's some bond claims,

12   we'll --

13        Q.   Hold tight for a second.

14        A.   Okay.

15        Q.   Did you talk to Sam?

16        A.   No.  No.

17        Q.   So, what you're saying now you got from Mr. Freuh?

18        A.   It's just a recollection that I had from a

19   conversation.  So, I didn't contact Sam because all of our

20   communications were through Brown --

21        Q.   Brown-Hiller?

22        A.   Yeah, through Brown-Hiller-Clark.

23        Q.   So, what was Mr. Freuh telling you that Mr. Derby

24   was telling him?

25        A.   I just remember it kind of being summarized as a

1   summary that, you know, if there's no bond claims at this

2   point that, you know, International Fidelity's not involved,

3   so that was the extent of it at that point, that basically

4   there wasn't anything they would do and we probably need to

5   get a lawyer and start letting the owners know that we're

6   serious about getting paid on this job.

7         Q.    Okay.   I'm handing you what's been marked as

8   Deposition Exhibit 10, Mr. Harrison.   It's a letter dated

9   October 30th, 2009, addressed to TriBuilt Construction Group

10  from Don Overton.   Do you recognize this letter as one you

11  would have received around I'm going to say early November of

12  '09?

13        A.    I don't know if this letter we actually received

14  because we had changed our agent of service, our agent, what

15  did you call that, our registered agent, I think prior to

16  October 30th, and so we may have gotten this letter just

17  because Ron Metcalf is courteous and would have gotten ahold

18  of me, but this letter looks familiar to me.   I just don't

19  know that I got it that way that you're mentioning it.   I may

20  have been gotten it through my attorneys.

21        Q.    I got you.   Okay.

22        A.    I'm not saying that I didn't get the letter.   I

23  just didn't get it the way that you're mentioning or --

24        Q.    I understand.

25        A.    -- at that time frame, but I have seen the letter,

1  yes, sir.

2      Q.   All right.  This is the whole basis for putting

3  this letter as an exhibit is what we're now marking as

4  Deposition Exhibit 11 and handing it to you, a document that

5  says down at the bottom in handwriting Ex. H and up at the

6  top it says Country Inn and Suites Subcontractor Suppliers

7  Unpaid with a total amount of $727,109.38, and I'm unclear in

8  my mind as to who prepared this Deposition Exhibit 11.  Can

9  you shed any light on that?

10     A.   I have no idea who prepared it.

11     Q.   Okay.

12     A.   I don't agree with it.

13     Q.   Okay.

14     A.   I don't agree with it.

15     Q.   All right.  So, you did not prepare Deposition

16  Exhibit 11 and send it back to Mr. Overton or cause it to be

17  sent back to him in response to Deposition Exhibit 10?

18     A.   No, sir.

19     Q.   Okay.  Would you glance at the list on Deposition

20  Exhibit 11 and tell me if any of the names appearing on it

21  did not work on the NISHA job?

22     A.   Conway Corp is not actually a contractor or a --

23  they're more of a vendor, a utility vendor.  That's item

24  number seven.

25     Q.   Okay.

1    A.    They're -- well --

2    Q.    Did you hire them to do any work on this job?

3    A.    Our agreement was we would pay temporary utilities

4  until the hotel got certificate of occupancy, and so I don't

5  believe that that balance is accurate because I -- and

6  numerous one of these are inaccurate because I don't know if

7  they've put penalty interest on it or service charges or

8  what, but I do know several of these I don't agree with, but

9  these all appear to be companies that had some involvement, I

10 would say, in the Country Inns and Suites, yes.

11   Q.    Some involvement as subcontractors or suppliers to

12 TriBuilt, correct?

13   A.    I would say to the project.

14   Q.    Well, let's back up then.  Other than Conway Corp,

15 which of these businesses on this list were not hired by

16 TriBuilt for work or materials in connection with the NISHA

17 project?

18   A.    Oh, I agree with that statement.  All of these.

19 Yes, I agree with that statement.  I wasn't trying to be

20 obtuse with you or anything.  I just meant they were specific

21 to that project on behalf of that project.

22   Q.    Oh, okay.

23   A.    I just don't agree with the balances.  But I didn't

24 prepare this document.

25   Q.    All right.  I'm handing you what's been marked as

1   Exhibit 12.  I don't have an extra copy, I'm sorry.  It's a

2   letter dated March 26th, 2010 from International Fidelity

3   Insurance Company, signed by Genise Teich, addressed to

4   TriBuilt Construction Group in care of Brian Meadors.  Have

5   you ever seen this letter before?

6       A.   I don't recognize this letter, but I do recognize

7   her name and obviously the company, but I don't specifically

8   remember this letter.

9       Q.   Well, if you would, please read it right now --

10      A.   I just -- okay.

11      Q.   -- if you don't remember it.

12      A.   No, I've never seen this letter.

13      Q.   You've never seen that letter?

14      A.   I've never read this letter, I should say.  I've

15  never read this letter before today.

16      Q.   Okay.

17  MR. TERRY:    May I have just a moment?

18      Q.   Sure.

19                  [OFF THE RECORD DISCUSSION.]

20  MR. TERRY:    Thank you.

21  CONTINUING BY MR. EAST:

22      Q.   Okay.  Would you be surprised if International

23  Fidelity as of March 26, 2010 had received claims against the

24  payment bonds totaling in excess of $450,000.00?

25      A.   No, I wouldn't.

1      Q.    Did TriBuilt in March of 2010 have $600,000.00 in

2  cash to put up as collateral?

3      A.    No.

4      Q.    I'm handing you Deposition Exhibit 13.  This is an

5  April 26, 2010 letter to TriBuilt in care of Brian Meadors

6  from me.  Have you ever seen this letter before?

7      A.    No.  But it went to my attorney and I didn't sign

8  for it.

9      Q.    Well, I understand that.

10     A.    Okay.

11     Q.    But you have, prior to today, you have never seen

12  Exhibit 13?

13     A.    It does not look familiar to me.

14     Q.    All right.  As I understand in connection with this

15  Federal lawsuit, you are basically asking the Court to allow

16  your attorneys, Mr. Meadors and Mr. Thompson, to be paid 24

17  percent of whatever recovery comes out of the Circuit Court

18  case.  Would you agree with that?

19     A.    Yes.  I would agree with that, yes.

20     Q.    All right.  Well, if the recovery in the Circuit

21  Court case is less than the amount paid by International

22  Fidelity to subs and suppliers under its bonds, how do you

23  propose to pay International Fidelity for its losses on those

24  bonds under your indemnity agreement?

25  MR. TERRY:    I'm going to object to the form of the

```
 1              question and for the record would state that I
 2              think that it calls for a legal conclusion on
 3              behalf of the witness that I think is an ultimate
 4              legal issue in the case.  I certainly have no
 5              objection to his answering the question if he can,
 6              but whatever answer he gives can't bury our legal
 7              position that we've staked out in our motion for
 8              summary judgment that's presently pending.
 9         Q.   Go ahead.
10         A.   Mr. East, my answer will be a little circular, but
11    I have an answer for you.  If I was -- if I had not hired our
12    attorneys, I would have to sue NISHA to collect funds that
13    are rightfully ours, I wouldn't have any way of being able to
14    collect money in order to pay any claims that your client has
15    paid on our behalf.  So, that's the direction that has
16    brought us here for this contingency dispute, contingency fee
17    dispute between your client and myself is that I need a way
18    in order to get the owners of the hotel to pay me what's
19    right for the quality hotel that they have been open for over
20    nine months and generating revenue.  There's no -- there's no
21    workmanship issue, there's no -- we completed the hotel in a
22    timely manner.  They have refused to pay us for their poorly
23    designed plans or the change orders resulting for the poorly
24    designed hotel and the retainage that is rightfully ours,
25    which would allow us to have paid all of these subs where you
```

1    wouldn't have had any claims, but because they refused to do
2    that, we had paid your client 54, $60,000.00, somewhere in
3    that neighborhood, to be a surety on our behalf, and we have
4    got multiple lawsuits because there have been legitimate
5    claims by subcontractors who haven't paid us.  We are being
6    sued by subcontractors who haven't been paid.  We're having
7    to defend ourselves.  So, the answer to your question is if
8    it's less, we'll still be responsible for it, but it will be
9    far less than we're responsible for right now, and we're
10   trying to do everything we can to get money out of the owners
11   so that we can pay International Fidelity any claims that
12   they pay out, which they've not paid a lot of claims from
13   what I understand, and to pay the other legitimate supplier
14   and vendor relationships.  Without us hiring an attorney and
15   working on a fee agreement that would help us, we're not
16   going to get anything and your company will wind up paying
17   all of these claims that are legitimate and we'll wind up
18   filing bankruptcy because we won't be able to get any money
19   because we've never filed -- we've never fought these owners
20   who haven't paid us.  So, if we're short, we'll have to work
21   out some kind of arrangement with International Fidelity,
22   either some type of promissory note or something along those
23   lines, but I understand that I have an indemnity arrangement
24   with the surety, that I have to indemnify them, but I need my
25   hands unshackled so that I can go and collect as much as I

1   can so that your client doesn't have to pay any claims and I

2   can pay the people that did all of this work to give those

3   owners a quality hotel.  So, that's a long-winded answer,

4   but, you know, I hate that we have to be here just so that I

5   can maintain a relationship with my own attorney, because I

6   can't pay them an hourly rate.  I can't afford to pay them an

7   hourly rate to keep them going to get the money that we all

8   need so that your client doesn't have to pay anymore claims

9   and we can get paid what's rightfully ours.

10      Q.   So, what you're proposing is to pay your attorneys

11  upfront and then worry about reimbursing International

12  Fidelity later, is that correct?

13      A.   If that's your interpretation of it, yes.

14  MR. EAST:     Okay.  That's all.

15  MR. TERRY:     One other thing.  Jack, we've never seen this

16              document before that you questioned Mr. Harrison

17              about and we'd like to make this an exhibit to the

18              deposition, as well.

19  MR. EAST:     Oh, of course.  That's fine.

20  MR. TERRY:     That will be Deposition Exhibit Number 14.

21              [DEPOSITION CONCLUDED AT 11:18 A.M.]

22

23

24

25

```
1                            CORRECTION PAGE

2   Corrections to be made by ALAN HARRISON:

3   Page      Line      Deletion, Addition or Change and Reason:

4   ____      ____      _____

5   ____      ____      _____

6   ____      ____      _____

7   ____      ____      _____

8   ____      ____      _____

9   ____      ____      _____

10  ____      ____      _____

11  ____      ____      _____

12  ____      ____      _____

13  ____      ____      _____

14  ____      ____      _____

15  ____      ____      _____

16  ____      ____      _____

17  ____      ____      _____

18  ____      ____      _____

19  ____      ____      _____

20  ____      ____      _____

21  ____      ____      _____

22  ____      ____      _____

23  ____      ____      _____

24  ____      ____      _____

25  ____      ____      _____
```

1                           SIGNATURE PAGE

2

3          Now on this ____ day of _____, 2010, I have had

4    submitted to me for examination a transcription of testimony

5    given by me on deposition consisting of 42 pages, taken on

6    June 24, 2010, and after having read same I hereby certify

7    that the foregoing transcription is true and correct, with

8    the exception of the corrections as noted on Page 40 hereof,

9    if any.

10

11                                _____
                                  ALAN HARRISON
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         CERTIFICATE

 2        I, Nancy Bland, Certified Court Reporter, do hereby
     certify that the witness, ALAN HARRISON, was duly sworn by me
 3   prior to the taking of testimony as to the truth of the
     matters attested to and contained therein; that the testimony
 4   of said witness was taken by me in stenomask and was
     thereafter reduced to typewritten form by me or under my
 5   direction and supervision; that the foregoing transcript is a
     true and accurate record of the testimony given to the best
 6   of my understanding and ability.

 7        I further certify that I am neither counsel for, related
     to, nor employed by any of the parties to the action in which
 8   this proceeding was taken; and, further, that I am not a
     relative or employee of any attorney or counsel employed by
 9   the parties hereto, nor financially interested, or otherwise,
     in the outcome of this action; and that I have no contract
10   with the parties, attorneys, or persons with an interest in
     the action that affects or has a substantial tendency to
11   affect impartiality, that requires me to relinquish control
     of an original transcript or copies of the transcript before
12   it is certified and delivered to the custodial attorney, or
     that requires me to provide any service not made available to
13   all parties to the action.

14        IN WITNESS WHEREOF, I have hereunto set my hand and
     seal.
15

16                              _____
                                Nancy Bland
17                              Certified Court Reporter
                                State of Arkansas
18                              Certificate No. 321

19

20

21

22

23

24

25
```