UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

TRIBUILT CONSTRUCTION GROUP, LLC PLAINTIFF

vs. Case No. 10-2052

INTERNATIONAL FIDELITY INSURANCE COMPANY DEFENDANT and COUNTERCLAIMANT

INTERNATIONAL FIDELITY INSURANCE COMPANY THIRD PARTY PLAINTIFF

vs.

ALAN M. HARRISON, GAYE P. HARRISON, JOSEPH E. MARRONE, STACY M. MARRONE, and SOUTHLAND ENTERPRISES, LLC THIRD PARTY DEFENDANTS

---

Deposition of
JOSEPH MARRONE
June 24, 2010, 11:24 a.m.

---

| APPEARANCES: | ON BEHALF OF: |
|---|---|
| Mr. Brian M. Meadors<br>Pryor, Robertson, Beasley & Smith<br>P.O. Drawer 848<br>Fort Smith, AR 72902-0848 | Plaintiff |
| Mr. Jack East III<br>Attorney at Law<br>2725 Cantrell Road, Suite 202<br>Little Rock, AR 72202 | Defendant |
| Mr. Rex M. Terry<br>Hardin, Jesson & Terry<br>5000 Rogers, 5th Floor<br>Fort Smith, AR 72903 | Third Party Defendants |

ALSO PRESENT: Mr. Alan Harrison

NANCY BLAND, CCR
LEGAL ASSIST
P.O. Box 4143
Fort Smith, Arkansas 72914-4143
(479) 782-4445



Deposition of JOSEPH MARRONE was taken on June 24, 2010, at the office of Hardin, Jesson & Terry, Fort Smith, Arkansas, before me, Nancy Bland, a Certified Court Reporter within and for the State of Arkansas, in a certain cause styled on page one hereof.

STIPULATION

It is hereby stipulated and agreed by and between counsel for the parties hereto that the deposition testimony of JOSEPH MARRONE may be taken before Nancy Bland, a Certified Court Reporter, at the above captioned time and place.

Said deposition is taken pursuant to Rule 32(a)(3), Arkansas Rules of Civil Procedure (Rule 30, Federal Rules of Civil Procedure), with the specific understanding that any objections as to relevance, immateriality, or incompetency are reserved and may be made at the time the deposition is first offered into evidence. Objections as to form of questions are to be noted at the time of taking of the deposition.

All formalities with reference to taking, transcribing, forwarding and filing of said deposition are waived.

PROCEEDINGS

JOSEPH MARRONE, after being sworn, testified on his oath, as follows:

DIRECT EXAMINATION

BY MR. EAST:

Q. Mr. Marrone, you have been present throughout the deposition of Mr. Harrison, is that correct?

A. That's correct.

Q. All right. Again, have you had your deposition taken?

A. No.

Q. All right. I would repeat my suggestions to you that I made to Mr. Harrison on the front end. If you don't understand a question, please let me know. Will you do that for me?

A. Yes.

Q. And verbalize your response rather than the nod or the shake of the head, uh-huh or huh-uh.

A. Okay.

Q. Is that okay?

A. Yes.

Q. And how old are you, Mr. Marrone?

A. Thirty-nine.

Q. What's your educational background?

A. I have a GED.

Q. When did you get that degree?
A. 1991.
Q. What's your work experience?
A. Everything else since that?
Q. Yes.
A. Is out in the field working. I mean, I've been in residential construction until about six years ago, started some light commercial, and then developed into full commercial with my partnership with Alan.
Q. Full commercial partnership with Alan. What kind of buildings do you all construct?
A. We have constructed single family to duplexes to four-story hotels, all conventional framing, no steel or wrought-iron work.
Q. What's the biggest job you did?
A. I would say the Country Inn and Suites is the largest project we worked on together.
Q. Roughly 3.6 million to four million dollars?
A. Yes.
Q. What's the second biggest job you ever did?
A. Another hotel we did a year and a half prior, the Microtel Inn and Suites in the same city.
Q. And how big was that job?
A. Similar in size and scope maybe minus 800,000. I can't remember the final number on that.

Q. You didn't have to get a bond for that job?
A. Correct.
Q. What's your experience in obtaining performance and payment bonds from bonding companies on construction jobs?
A. No experience.
Q. All right. So, would I be correct in stating that the International Fidelity performance and payment bonds on the NISHA job were the first performance and payment bonds you've ever had to get?
A. Yes.
Q. What is your ownership position in TriBuilt?
A. Percentage wise?
Q. Yes.
A. Fifty percent.
Q. And what are your duties for TriBuilt?
A. As -- my titles, I guess, have kind of gone from member to vice-president to that kind of role as quality control, maintaining relationships with the subcontractors and vendors and relationships with our superintendents and project managers, oversight.
Q. All right. In the 2008-2009 time frame, who was the project manager on the NISHA project?
A. We shared that role, Alan and I, and we shared a little bit of those responsibilities with our on-site superintendent, John Lightsey.

Q. Mr. Lightsey was your ground zero guy for building the job, was he not?
A. Yes.
Q. And would you -- if I'm going to try to pigeon-hole you, and I don't know whether you can be, you are kind of the general superintendent over all of the jobs. Would that be a good description?
A. I guess that would be one of them.
Q. But you also perform some project manager duties?
A. Mainly negotiating and finding products and things like that.
Q. You and I have been talking about the project manager. What is a project manager?
A. Actually a good project manager is a lot smarter than I am. Dealing with the acquisitions and the forms and the paperwork and organizational skills, and so really I do better just to hire a good project manager.
Q. And what does a good project manager do?
A. Just that, taking care of the organizational parts of all of the products and submittals and approvals and different things like that.
Q. Were there submittals and shop drawings and that kind of thing on this NISHA project?
A. Yes.
Q. And to whom did you send those?

A. We dealt directly with the owners on a lot of this stuff and we dealt directly with the architect on a lot of these things. So, the architect and the owners had to approve all of the products, but then they had to get approval from their franchise, which was Carlson. So, there's three entities that had to approve and argue about whether or not it could go in the hotel.

Q. Did you deal with Carlson through the architect's office or through NISHA or direct? How did that happen?

A. I'd say all of the above. We had -- we had some direct correspondence with Carlson. We had some indirect correspondence with them through the architect and through the owner.

Q. Who was responsible for presenting change orders to NISHA on this job?

A. Who individually?

Q. Yes.

A. I'm not sure I can say. I don't know what person carried that role on their shoulders directly.

Q. There were some written change orders --

A. Yes.

Q. -- to the contract, were there not?

A. Uh-huh.

Q. Who negotiated those change orders from TriBuilt's perspective?

A. We had meetings with the owners in our job trailer and most of those change orders were brought up then. Most of those discussions got so uncomfortable that it evolved into no longer dealing directly with the owners because of the emotions and the intensity of those conversations that we via the recommendation of the owner dealt directly with the architect from a certain point on.

Q. Was this in the middle of the job, the beginning --

A. Closer to the earlier stages of the job.

Q. The beginning of the job, okay. Well, are there any written memoranda concerning those discussions?

A. Which discussions?

Q. Those change order discussions in the trailer. Any minutes of those meetings?

A. I don't think we kept minutes of the meetings, no.

Q. Any writing talking about those meetings?

A. The meetings or the change orders?

Q. Either one.

A. There were certain change orders that were in writing and that got approved, there were certain things that got argued about, and then there was a time when there was a document, I think, via e-mail that told TriBuilt that we need to deal with Chase Garrett concerning all changes.

Q. There's something in writing from NISHA to TriBuilt saying deal with the architect on change orders?

A. The direction of that e-mail I'm not sure how it goes, but, yes.

Q. So, then after that did you deal with Mr. Garrett about change order work?

A. Frequently.

Q. And after that did he approve change order work?

A. I would say every time.

Q. Every time. Anything in writing about those approvals?

A. Everything documented.

Q. Everything documented, signed by Mr. Garrett?

A. Mr. Garrett stated he doesn't need to sign anything, that the e-mails are sufficient.

Q. Okay. If you would, look at Exhibit 4, Deposition Exhibit 4 to Mr. Harrison's deposition. There it is. Deposition Exhibit 4 is entitled Agreement of Indemnity and it's dated 6 October, 2008, and it bears your notarized signature on the last page, I believe.

MR. TERRY: Page ten, I think, Jack.

Q. Yeah, page ten. That is your signature?

A. Yes.

Q. Did you read this document before you signed it?

A. I had a thorough understanding of it. I did not read it, no, sir.

Q. You had a thorough understanding?

A. Uh-huh.
Q. What do you mean by that?
A. Well, I had it explained to me.
Q. At that time you had it explained to you?
A. I can't say at the moment of signing, but I knew what this agreement of indemnity meant.
Q. And who told you that?
A. We had conversations in office between all of us and with Brent and with Sam and understood that you basically guarantee those being indemnified. I don't know if that makes sense or not. I'm trying to make sense out of that.
Q. No, that's okay.
A. Okay.
Q. I understand. Well, did you have any discussion about paragraph four on page three? It's entitled trust fund.
A. Can you explain that to me?
Q. I don't think that's my role. I'm just wondering, Mr. Marrone, my question to you is, did you have any discussions about this fourth paragraph of the General Agreement of Indemnity?
A. I can't remember specifically.
Q. You had discussions in the office. Who was involved in these discussions?
A. Alan Harrison and, you know, I can't recall the

specific conversations. I guess generally speaking when they signed these papers to get bonded, you need the bond to get the job and you need to sign the document to get the bond to get the job and you understand that there's risks involved and so you sign the paper.

Q. All right. You needed to sign that to get the bond?

A. Yes.

Q. And you did?

A. Yes.

Q. All right. If you would, look at Exhibit Number 12, Deposition Exhibit 12. This is that March 26, 2010 letter from Genise Teich, T-e-i-c-h, to TriBuilt in care of Brian Meadors. Have you ever seen this letter before today?

A. No.

Q. Paragraph two of this letter says that International Fidelity has received claims in excess of $450,000.00 on the NISHA job. Do you have any reason to dispute that amount of claims on the NISHA job?

A. No, I don't have a reason to dispute it.

Q. And it demands on page two of the letter $600,000.00 in collateral. TriBuilt has not had $600,000.00 to put up with IFIC, with International Fidelity as collateral at any time this year, has it?

A. No.

Q. And if you will look at Deposition Exhibit 13, which is the next exhibit. It is a letter dated April 26, 2010 to TriBuilt in care of Brian Meadors from me. Have you ever seen this letter before today?

A. I haven't seen the letter.

Q. Has TriBuilt to your knowledge opened a trust account with a bank or similar institution for the deposit of funds received from NISHA in connection with the project?

A. Jack, I don't see lots of documents that come through. I'm not the document overseer guy.

Q. Well, how many bank accounts does TriBuilt have?

A. Numerous. But I wanted to finish that by saying I do believe I remember hearing that we were prepared to put the funds received from this case into an account for --

Q. Now don't tell me anything that you've talked to your lawyer about.

A. For --

MR. MEADORS: He can do that. We'll waive.

A. Okay. For disbursement. So, it looks like that had something to do with this letter because this letter, if I read it correctly, says that all monies received in relationship to this suit, and I ad lib that because I think that's what it meant, not all monies received by any job TriBuilt does goes into this account, it's related to this suit. I can remember the conversation because we wouldn't

have a problem with making sure all money went somewhere safe, getting out of the unsafe hands of a bank we don't trust, getting into the hands of somebody that we do trust so we can pay people. So that makes perfect sense to me. You asked -- the answer to that's a roundabout way to answer it. Did we open an account for this? No, I don't think so.

Q. Okay. You say TriBuilt has numerous bank accounts, is that correct?

A. We have numerous banking relationships and those come with bank accounts.

Q. All right. Were any of those accounts established for the purpose of depositing NISHA job receivables into it specifically?

A. One safety net that we have put in place is that on the large-scale projects, $100,000.00 or more jobs, we run every receivable and payable out of one bank account for that job, and this job had such a bank account. Every check that we received was deposited into one account, which made it easy for us to trail every dollar spent, a safeguard for mishandling money, a safeguard against robbing Peter to pay Paul, a safeguard against losing track of profit and loss.

Q. So, you did have one bank account dedicated to this particular job?

A. Yes.

Q. Okay. Well, when did you realize that there was

not going to be enough money on this job to pay all of the bills?

A. I don't think the reality of not having enough money was the one that was the big realization, but the realization that we were dealing with the owners that weren't going to pay what they owed. That was the big realization.

Q. Okay. And when did you realize that?

A. I can't recall the date. I can recall a meeting where I had face-to-face with the owners that were resistant to write checks, and that was pretty sobering.

Q. Okay. Well, you substantially completed the job according to Mr. Harrison sometime in late August of 2009. Would you agree with that?

A. Yes.

Q. Did you realize you weren't going to have enough money to pay all of the bills on this job before that or after that? Or, I'm sorry. Did you realize you were dealing with owners that weren't going to pay all of the bills on this job before that or after that?

A. Realizing is a definite position. Suspicion is not. So, we were suspicious before.

Q. Okay. Well, you didn't bill them until September. You didn't present the final bill until September?

A. Which is not unusual.

Q. When did you start getting behind on paying the

subcontractor bills?

A. I don't know.

Q. Let's go off the record.

[OFF THE RECORD DISCUSSION.]

MR. EAST: We're done.

MR. TERRY: Okay. Reserve signature.

[DEPOSITION CONCLUDED AT 11:54 A.M.]

CORRECTION PAGE

Corrections to be made by JOSEPH MARRONE:

Page Line Deletion, Addition or Change and Reason:

SIGNATURE PAGE

Now on this ____ day of ______________, 2010, I have had submitted to me for examination a transcription of testimony given by me on deposition consisting of 18 pages, taken on June 24, 2010, and after having read same I hereby certify that the foregoing transcription is true and correct, with the exception of the corrections as noted on Page 16 hereof, if any.

____________________________________
JOSEPH MARRONE

CERTIFICATE

I, Nancy Bland, Certified Court Reporter, do hereby certify that the witness, JOSEPH MARRONE, was duly sworn by me prior to the taking of testimony as to the truth of the matters attested to and contained therein; that the testimony of said witness was taken by me in stenomask and was thereafter reduced to typewritten form by me or under my direction and supervision; that the foregoing transcript is a true and accurate record of the testimony given to the best of my understanding and ability.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested, or otherwise, in the outcome of this action; and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide any service not made available to all parties to the action.

IN WITNESS WHEREOF, I have hereunto set my hand and seal.

Nancy Bland
Certified Court Reporter
State of Arkansas
Certificate No. 321

CERTIFIED COURT REPORTER
ARKANSAS SUPREME COURT NO. 321
NANCY BLAND