## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FORT SMITH DIVISION

**TRIBUILT CONSTRUCTION GROUP, LLC**                    **PLAINTIFF**

**v.**                          **Case No. 10-2052**

**INTERNATIONAL FIDELITY**                       **DEFENDANT and**
**INSURANCE COMPANY**                        **COUNTERCLAIMANT**

**INTERNATIONAL FIDELITY**                          **THIRD PARTY**
**INSURANCE COMPANY**                             **PLAINTIFF**

**v.**

**ALAN M. HARRISON, GAYE P. HARRISON,**
**JOSEPH E. MARRONE, STACY M. MARRONE,**            **THIRD PARTY**
**and SOUTHLAND ENTERPRISES, LLC**                 **DEFENDANTS**

## BRIEF IN SUPPORT OF RESPONSE TO
## MOTION FOR SUMMARY JUDGMENT

### I.
### Background

Plaintiff's Complaint asserts entitlement to declarative relief under the authority of A.C.A.

§ 16-111-101 et seq. The relief sought is a declaration that plaintiff's attorneys are entitled to collect

and retain a 24% contingency fee out of funds constituting trust funds for the benefit of plaintiff's

subcontractors, material suppliers and defendant, International Fidelity Insurance Company (IFIC).

IFIC opposes plaintiff's Motion for Summary Judgment.

The following facts are largely undisputed:

1.     In August, 2008 plaintiff (TriBuilt), as prime contractor, agreed to construct a Country Inns

and Suites hotel/motel (Project) in Conway, Arkansas for NISHA, LLC (NISHA), as owner. The

contract price was $3,628,000.00 and the required completion date was May 30, 2009.

2.     The written construction contract included the following relevant provisions:

ARTICLE 6.    DUTIES OF THE CONTRACTOR

...

6.5    Upon satisfactory payment being made for any portion
of the work performed, Contractor shall furnish a full and
unconditional release from any claim or mechanics' lien
for that portion of the work for which payment has been made.
Contractor will also supply Owner will sub-contractor [sic] progress
billing lien releases as payments are made.

...

ARTICLE 15.    ATTORNEY FEES

15.1    In the event of any arbitration or litigation relating to the
project, project performance or this contract, the prevailing
party shall be entitled to reasonable attorney fees, costs and
expenses.

ARTICLE 16.    ACCEPTANCE AND OCCUPANCY

16.2    Retainage and any final balances due to the Contractor
will be released within 30 days of issuance of Certificate of
Occupany and satisfactory inspection by Carlson-Country
Inns and Suites.

16.3    Owner agrees that the Contractor will be authorized to
request and receive payment directly from Owners Lender for
any outstanding balance due upon completion (ie retainage,
change orders).  This authorization is only for the final
payment due to the Contractor, and requires that the Contractor
has satisfied item 16.2. Owner agrees to execute any document,
prior to beginning construction that the lender may require,
in order to release final payment to the Contractor.

16.3    [sic] Contractor agrees to provide the Owner or the Owner's
Lender all final unconditional lien waivers upon receipt of
final payment of the outstanding balance.

3.    The "General Conditions", made a part of the construction contract in Contract Article 1,

further provide:

ARTICLE 3.    CONTRACTOR

3.2    Unless Contract Documents give other specific instructions
concerning these matters, the Contractor shall provide and pay for
all labor, materials, equipment, tools, construction equipment and
machinery, water, heat, utilities, transportation and other facilities
and services necessary for the proper execution and completion

2

of the work, whether temporary or permanent and whether or not incorporated or to be incorporated in the work.

4.    After the execution of the construction contract the parties signed a September 4, 2008 "Correction to Fixed Contract" requiring TriBuilt to bond the Project performance and obtain a payment bond. See Response Exhibit A. TriBuilt was unable to obtain a performance and payment bond in an amount equal to the contract price, however, IFIC agreed to issue a series of bonds in smaller amounts as the Project progressed. Thus, on October 15, 2008 the parties entered into an "Addendum to the Fixed Contract" segregating the Project into 8 phases - by Work Order - for bonding purposes. See Response Exhibit A.

5.    On that same day (October 15, 2008) the parties agreed to two other Addenda. The first increased the retainage amount to $375,000.00. The second was a document entitled "Authorization to Release Payment". (This second document is one of the bases for the dispute between NISHA and TriBuilt over whether TriBuilt must furnish final lien waivers before NISHA's duty to pay is triggered.)

6.    TriBuilt substantially - if not fully - completed the Project on August 31, 2009, however, an argument developed between TriBuilt and NISHA over whether final lien waivers from TriBuilt's subcontractors had to be furnished prior to NISHA's duty to make final payment of the retainage. TriBuilt also submitted a "final" certificate for payment asserting NISHA owed an additional $291,462.12 to TriBuilt for extra work. NISHA disputes this claim.

7.    In September and October, 2009 NISHA received information that TriBuilt owed over $664,000.00 to its Project subcontractors; and these subcontractors have filed, or are starting to file, mechanic's liens against the Project.

8.    By letter dated November 5, 2009 TriBuilt forwarded a list of unpaid bills to IFIC. IFIC

3

responded on November 12, 2009 by asking NISHA not to release any further payment to TriBuilt pending IFIC's investigation. Since then IFIC has received over $535,000.00 in claims from TriBuilt's Project subcontractors.

9.      TriBuilt sued NISHA and its lender for breach of contract and various torts in November, 2009. The contract claims have been referred to arbitration. The tort claims are pending in the Circuit Court of Sebastian County, Arkansas. TriBuilt did not assert or file a Mechanic's Lien on the Project. The action before this Court arises out of TriBuilt's desire to "fund" its attorney fees with a contingency fee to be taken out of any recovery of the $375,000.00 retainage and claim for extra work. TriBuilt sought IFIC's agreement to this arrangement by letter dated February 23, 2010. See Exhibit B to Plaintiff's Statement of Undisputed Facts. After the exchange of several emails IFIC informed TriBuilt it "[would] not object" to TriBuilt's 24% fee claim except for the undisputed portion of the retainage which, at that point, was around $114,000.00, and conditioned on IFIC's ability to avoid litigation. At that point TriBuilt ceased negotiations and immediately sued IFIC for a declaratory judgment. IFIC has removed the action to this Court on diversity grounds.

## II.
## TriBuilt Is Not Entitled to a Declaratory Judgment

### A.
### Introduction

Plaintiff apparently argues the primary issues in this case relate to defendant's "insurance company" subrogation rights and the reasonableness of the fee. The overriding issue, in defendant's opinion, is whether plaintiff may pay its attorneys from funds to which IFIC has superior rights under principles of equitable subrogation and - more specifically - out of trust funds.

First, please note this case is governed by principles of suretyship rather than principles of

4

insurance.  As noted by the Eighth Circuit, quoting from 50 Am. Jur. § 313:

> "While it is a rule that the courts, in construing an ambiguous
> provision in a compensated surety contract, apply the rules
> applicable to insurance contracts, and while insurance contracts
> are in many respects similar to surety company contracts, yet,
> it is said, there is a wide difference between the two contracts.
> Insurance has been defined as a contract whereby one under-
> takes to indemnify another against loss, damage or liability
> arising from an unknown or contingent event; whereas a
> contract of suretyship is one to answer for the debt, default
> or miscarriage of another, and the nature of the contract is
> not altered because made by a corporation for compensation.
> The contract creates a tripartite relation between the
> party secured, the principal obligor, and the surety, and the
> rights, remedies and defenses of a surety cannot be
> disassociated from this relationship although the contract
> is called one of insurance.  * * * "

*Madison County Farmers Association v. American Employers' Ins. Co.*, 209 F.2d 581 (8th Cir.

1954).  One of the rights of a surety is the right of subrogation.  *Prairie State Bank v. United States*,

164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896); *American Bank & Trust Co. v. Langston*, 180 Ark.

643, 22 S.W.2d 381 (1929); *Exchange Bank & Trust Co. v. Texarkana School Dist. No. 7*, 227 Ark.

759, 301 S.W.2d 453 (1957); *In re J.V. Gleason Co.*, 452 F.2d 1219 (8th Cir. 1971); *Pennsylvania*

*National Mutual Casualty Ins. Co. v. City of Pine Bluff*, 354 F.3d 945 (8th Cir. 2004).  As these

cases illustrate a construction bond surety  may, under various circumstances, step into the shoes of

the owner, the contractor or the subcontractors and suppliers.  In this case, IFIC is subrogated to the

rights of TriBuilt's subcontractors IFIC has now paid due to TriBuilt's failure to pay them.

## B.
## Equitable Subrogation

IFIC would ask the Court to note TriBuilt's promise to NISHA to pay its subcontractors and

materialmen; and to furnish lien waivers from them.  See Contract at Article 16, 16.3 and Article 3

5

of the General Conditions. It is not disputed TriBuilt failed to fulfill these promises. It is also undisputed that TriBuilt promised to indemnify IFIC from and against any loss occasioned by the issuance of the Project payment bonds; and that IFIC has "lost" - or paid - TriBuilt's debts to Project subcontractors and suppliers of over $343,000.00 to date.

In *Exchange Bank & Trust Co. v. Texarkana School Dist. No. 7*, 227 Ark. 759, 301 S.W. 2d 453 (1957) a similar factual pattern occurred. In that case, however, the contractor assigned its right to payment to the Exchange Bank & Trust. The contractor later defaulted in both the performance of the project and in payment of project subcontractors and materialmen. Contractor's surety completed the work and paid the subcontractors and suppliers. Contractor's bank, as assignee, sued the project owner for the retainage. Contractor's surety intervened, asserting its subrogation rights to the retainage. The Arkansas Supreme Court recognized and affirmed surety's paramount right to the retainage, stating:

> Let it be remembered that [Bank's] action here is derivative through [Contractor], and [Bank] may not maintain any action against the [Owner] that [Contractor] could not assert. That [Contractor] was in default is not disputed; that it was indebted for labor and materials on the job in an amount in excess of funds held by the [Owner] is not disputed. Accordingly, it would not be contended that the district should have paid the monies over to [Contractor]. The same reasoning applies to the rights of the surety. There was a clear duty and obligation upon the [surety] to pay the outstanding indebtedness of its principal, and to complete the contract. This it did at a cost stipulated to be reasonable. The doctrine of equitable subrogation clearly applies.

*In re J.V. Gleason Co.*, 452 F.2d 1219 (8th Cir. 19741) involved a similar issue as well. In that case, the fight was between a surety and a bankruptcy trustee for the contractor. The trustee contended surety's equitable subrogation rights were a "security interest" under the Uniform Commercial Code which had to be perfected by filing but was not. The surety disagreed. The

6

Referee in bankruptcy and District Court, "held that under the doctrine of subrogation an equitable

lien was created at the time the surety completed performance on the contracts, and the lien related

back in time to the making of the suretyship contract, thus giving the surety superior rights to the

retained percentages. The Eighth Circuit affirmed, holding that a surety's right of equitable

subrogation to retained percentages is superior to a bankruptcy trustee's right. Footnote eleven of

the opinion cites *United States v. Durham Lumber Co.*, 363 U.S. 522, 80 S.Ct. 1282, 4 L.Ed. 2d.

1371 (1960) for the principle that, "a contractor only has a property right in retained funds to the

extent the funds exceed other claims for labor and material furnished for performance." Please note

this is because the very purpose of retainage is to protect a project owner <u>and</u> a payment bond surety

from the claims of a contractor's unpaid subcontractors and material suppliers. *Pennsylvania*

*National Mutual Casualty Ins. Co. v. City of Pine Bluff*, 354 F.3d 945 (8th Cir. 2004). As noted by

the Eighth Circuit in the *City of Pine Bluff* case:

> In Arkansas, as elsewhere, when a surety completes work or
> pays laborers and material suppliers, equitable subrogation
> permits the surety to proceed against retainage and remaining
> contract funds for reimbursement. Equilease Corp. v. United
> States Fid. & Guar. Co., 565 S.W.2d 125, 126 (Ark. 1978);
> Pearlman v. Reliance Ins. Co., 371 U.S. 132, 139 (1962)
> ("[T]he same equitable rules as to subrogation... exist
> whether a surety completes a contract or whether, though not
> called upon to complete the contract, it pays the laborers and
> materialmen."). The surety's right to these monies is typically
> superior to the rights of the general contractor's assignees or
> estate in bankruptcy because the surety's rights vest upon
> "full satisfaction for default and relate back to the time the
> bond or contract of suretyship was entered into." Equilease
> Corp., 565 S.W.2d at 126 (citation omitted); Restatement
> (Third) of Suretyship and Guaranty § 31(b). Thus, if the
> City were still holding retainage or contract funds, extant
> Arkansas law would provide for Penn National's
> reimbursement, and Penn National would be entitled to

> priority over Mitchell [the contractor] and Mitchell's creditors.
> ...
> Although Penn National does claim that the City breached a
> duty, the duty is more appropriately viewed as one arising
> from contract and equity. Bonds are contracts, and suretyship
> status is created through a triparite agreement "whereby one
> party (the surety) becomes liable for the principal's or
> obligor's debt or duty to the third party obligee." Balboa
> Ins. Co. v. United States 775 F.2d 1158, 1160 (Fed. Cir. 1985).
> Thus, when the surety performs the underlying obligation
> by completing work or paying subcontractors, the surety
> fulfills not only its contractual obligation under the bond
> but also the general contractor's contractual duties to the
> obligee and to subcontractors. Likewise, the right of
> subcontractors and the subrogated surety to be paid from
> funds held by the obligee arises in equity. Sureties bond
> projects with these rights in mind and with the legitimate
> expectation that the security ensuring discharge of the
> underlying obligation will be properly applied.

As the Court can readily observe, the foregoing cases establish that IFIC's equitable subrogation rights, as surety for TriBuilt, are superior to TriBuilt's rights, as principal and contractor. Under these circumstances, TriBuilt simply lacked the authority to pledge a portion of the retainage and change order amounts due as a contingency fee to its attorneys.

### C.
### The Funds Out of Which Plaintiff Seeks to Pay Its Attorney Fees Are Trust Funds for IFIC and TriBuilt's Subcontractors.

This case also involves IFIC's contractual rights as indemnitee and trust beneficiary under the terms of the Agreement of Indemnity attached to the Complaint as Exhibit A. It is undisputed that TriBuilt and its owners executed the Agreement of Indemnity (GAI). That document requires that all Project contract receivables be considered trust funds for the benefit of TriBuilt's Project subcontractors, material suppliers, and IFIC. The Fourth paragraph of the GAI provides:

8

## TRUST FUND

> FOURTH:    The Contractor, the Indemnitors hereby consenting,
> agrees that all monies due or to become due under any contract or
> contracts covered by the Bonds are trust funds, whether in the
> possession of the Contractor or otherwise, for the benefit of
> persons performing labor or providing materials for projects
> covered by the Bonds and for payment of all obligations in
> connection with any such contract or contracts for which the
> Surety would be liable under any said Bond, which trust funds also
> inure to the benefit of the Surety for liability or loss it may have or
> may sustain under any said Bond, and further agrees to use such
> money for the purpose of performing the contract and discharging
> the obligations of the Bond and for no other purpose until the Bond
> is completely exonerated. If the Surety discharges any such
> obligation, it shall be entitled to assert the claim of such person to
> the trust funds.

This provision specifically protects the prime contract receivables from the claims of all persons

except IFIC and those having claims against IFIC's payment bonds. Under this important provision

TriBuilt lacked the ability to enter into a contingency fee contract concerning the trust res over the

objections of IFIC and other beneficiaries because the equitable ownership of the res is in IFIC and

material suppliers. *In re Smith*, 238 B.R. 664 (Bankr. W.D. Ky. 1999); *In re Herndon*, 277 B.R. 765

(Bankr. E.D. Ark. 2002); *In re Fox*, 357 B.R. 770 (Bankr. E.D. Ark. 2007).

Please also note TriBuilt itself gains little as a result of the contingency fee arrangement

because each dollar of the trust res paid out in contingency fees must ultimately be repaid to IFIC

in any event by TriBuilt and the other indemnitors. (Please note, however, that IFIC limits its

position to the retainage and other alleged contract receivables, i.e., the claims for the "change order"

receivables. Any tort claims recoverable by TriBuilt are not part of the trust fund and, therefore, a

contingency fee arrangement concerning the tort claims is between TriBuilt and its attorneys.)

## III.
## Conclusion

This declaratory judgment Complaint seeks to have the Court approve of a scheme by which IFIC would pay TriBuilt's subcontractors and suppliers under its bonds but TriBuilt's attorneys would receive one-fourth of the recovery of retainage and other contract funds allegedly due. In light of the NISHA claims against TriBuilt for liquidated damages and other costs TriBuilt essentially seeks to leave IFIC "holding the bag". (Paragraph 32 of TriBuilt's Statement of Undisputed Facts - which asserts IFIC will be able to recover its loss from NISHA, TriBuilt and the Indemnitors - is untrue. TriBuilt and the Indemnitors are financially unable to pay for the Arbitration proceeding, not to mention IFIC's losses. Thus, the retainage and alleged contract change orders become particularly important to IFIC as a source of recovery.) Lastly, IFIC would note that TriBuilt's contract with NISHA authorizes TriBuilt to recover its attorney fees from NISHA if TriBuilt prevails in the arbitration. So, in fact, TriBuilt is not harmed by IFIC's equitable subrogation lien on the retainage and unpaid contract funds to the extent of its loss.

Plaintiff seeks to charge funds equitably belonging to IFIC with an attorney fee IFIC never agreed to pay and does not now agree to pay. Based upon IFIC's superior rights as subrogee and trust fund beneficiary, it is respectfully submitted the Motion for Summary Judgment should be denied.

/s/ Jack East III
Jack East III
2725 Cantrell Road, Ste. 202
Little Rock, AR 72202
(501) 372-3278
Bar ID No. 75-036

## **CERTIFICATE OF SERVICE**

I, Jack East III, hereby certify that on June 28, 2010, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF System which will send notification of such to the

following counsel of record:

Rex M. Terry, Esq.
5000 Roges Ave., Suite 500
Fort Smith, AR 72917-0127

/s/ Jack East III
Jack East III

11